UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY TORRES | : | CIVIL NO. 3:03CV696(JBA)(JGM) |
| v. | : | |
| JOHN TROMBLY, ET. AL. | : | APRIL 20, 2005 |

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

The remaining defendants, "John" [Anthony] Trombly, and Deborah Kindness, ("defendants" ) respectfully request that the Court grant their motion for summary judgment as to any and all remaining claims against them in their individual capacities.  Plaintiff alleges in his Second Amended Complaint, ("SAC") dated September 16, 2003, that his blood pressure medication was withheld on one, single occasion, on March 16, 2003.  See SAC at p. 2, ¶I. 1.  This Court, in its June 29, 2004 Ruling [Doc. #28] denying in part, while granting in part, defendants' motion to dismiss, noted, in part, "there are no facts in the record to evaluate whether Torres' medical condition is sufficiently serious to give rise to a constitutional violation, and whether withholding of medication on one day would carry a substantial risk of serious harm."  In order to supplement the record, the defendants respectfully submit, inter alia, the affidavit of Dr. Edward A. Blanchette, with the relevant medical records of the plaintiff attached thereto.  Dr. Blanchette attests that, "to a reasonable degree of medical certainty, that plaintiff is not at any substantial risk of serious harm by the withholding of medication on one day.  Indeed, plaintiff would have suffered no appreciable risk to his health by missing a single dose of his medication."  Defts.' Local Rule 56 Stmt.  ¶ 11.

Indeed, this Court correctly noted in its March 4, 2004 Ruling denying plaintiff's request for an injunction that "[e]ven if the plaintiff did not receive his medication on one day in March 2003, the plaintiff does not allege in his motion, memorandum or declaration that he suffered any ill health effects due to the denial of medication on that one occasion,…" Ruling at 4.  This Court's June 29, 2004 Ruling [Doc. # 28] states in relevant part, "Torres has not alleged any physical injury resulting from the denial of his medication on March 16, 2003" Ruling at 15.  Thus, this Court granted the motion to dismiss any and all claims for compensatory damages pursuant to 42 U.S.C. §1997e(e) for lack of any physical injury.  Id.  For these reasons, for the additional reasons set forth in the defendants' moving affidavits and supporting papers, and for reasons discussed below, the defendants' motion for summary judgment should be granted.

## FACTS

The material facts at issue in this case are not in genuine dispute, and thus, summary judgment is appropriate.  The defendants have submitted the affidavits of Dr. Edward Blanchette, Nurse Kindness, and Correction Officer (C/O) Trombly, and a Local Rule 56 (a)(1) Statement which are wholly incorporated by reference herein.  The material facts are summarized, in part, as set forth below.

Anthony Torres is a state prisoner presently incarcerated at Northern CI.  He is well known to the District Court having filed more than a half dozen lawsuits, the most recent of which was dismissed by Judge Droney as lacking any arguable legal basis; see 28 U.S.C. § 1915(e)(2)(B)(I).  See Torres v. Pellegrino, 3:03CV424(CFD)(D.Conn. Sept. 15, 2004).  Currently, Mr. Torres is being managed appropriately, well within acceptable standards of medical care, for a mild problem of hypertension (HTN), or high blood pressure.  His blood pressure readings, however, are monitored frequently (approximately monthly, except when

plaintiff refuses), and are well within acceptable limits. Indeed, they are quite good.  BA ¶7; KA ¶4. Deft. L. R. 56(a)1 Stmt.  ¶ 7.

For example, at p. 102 of the plaintiff's medical record, there is an order dated 1/26/01 for "BP's q wk  x 4 wk," [blood pressures weekly for four weeks] then monthly, with a goal range of <140/90.  Throughout 2001 and 2002, plaintiff's blood pressure checks were regularly excellent, ranging from 112/68 to 128/80. See p. 102, attached to Blanchette affidavit.  BA ¶8; KA ¶5.  Deft. L.R. 56 (a)1 Stmt. ¶8.  Blood pressure checks were continued monthly throughout 2003, as well as 2004-05, although Mr. Torres on a number of occasions refused to cooperate with medical staff to have his blood pressure measured.  The blood pressures which were charted around the time in question were completely within acceptable limits, with a reading of 108/70 on June 30, 2003, and 118/86 in August 2003.  See p. 11 of plaintiff's medical record. BA ¶9; KA ¶6. Deft. L.R. 56 (a)1 Stmt. ¶9.

On March 16, 2003, according to a medical refusal form, Nurse Kindness was assigned to pass out medication, and C/O Trombly was assigned as an escorting officer for her.  TA ¶4; Deft. L.R. 56 (a)1 Stmt. ¶22.  Anthony Trombly is employed as a correction officer ("C/O") by the Connecticut Department of Correction, and he has been so employed since October 5, 1990.  He has been employed at Northern CI since it opened. Trombly Affidavit ("TA") ¶1. L.R. 56 (a)1 Stmt. ¶19.  His duties include care and custody of inmates, and providing for reasonable safety and security for staff, inmates, the facility and the public.  TA ¶2. L.R. 56 (a)1 Stmt. ¶20.  At times, C/O Trombly may be assigned to be an escorting officer to provide a security escort for any staff or visitor who requires an escort.  TA ¶3; L.R. 56 (a)1 Stmt. ¶21.  C/O Trombly's duties do not include, nor have they ever included, passing out medication.  TA ¶5. L.R. 56 (a)1 Stmt. ¶23.

In order to pass meds, C/O Trombly escorts the nurse to the designated cell, he knocks on the door, which is a solid steel door with a small window, and he announces that the nurse is present for meds. The inmate remains in the cell for safety and security of staff, and medication is given if the inmate is properly attired, following orders, and cooperative. TA ¶7. L.R. 56 (a)1 Stmt. ¶25. The inmate must come to the door, and the C/O has to open the slot, often called the "trap," which is usually secured from the outside, and which the C/O opens so that the nurse may pass the med to the inmate through the slot in the door. TA ¶8; L.R. 56 (a)1 Stmt. ¶26. The nurse will give the medication to the inmate and basically C/O Trombly is just a security escort. TA ¶9; L.R. 56 (a)1 Stmt. ¶27. C/O Trombly does not know what medications are given, nor does he know for what reason a medication is ordered. That kind of information is kept confidential and is solely known to the nurse who is being escorted and who is responsible for medication administration. TA ¶10. L.R. 56 (a)1 Stmt. ¶28.

If the inmate is cooperative, and follows orders given, he will come to the door, take the medication which is offered, and stand next to the door, with his mouth visible through the window. The nurse will ask the inmate to open his mouth for a mouth check to make sure the inmate swallows the medication. C/O Trombly has observed this procedure performed by nurses, but he does not get involved in the medical issues. He is just there for safety and security concerns. TA ¶11; L.R. 56 (a)1 Stmt. ¶29. Obviously, if an inmate refuses to cooperate, for example by not following orders, not getting dressed properly, engaging in hostile verbal exchanges, or if the inmate demonstrates a belligerent attitude, for example by refusing to come to the door, the nurse may not be able to offer the medication due to the safety and security issues posed by the inmate. TA ¶12. L.R. 56 (a)1 Stmt. ¶30. Staff have been assaulted through the slot in the door with unknown liquid substances, often stored by the inmate in his toilet, to

4

include toilet water and human waste. If an inmate refuses his medication, that refusal would usually be documented by medical, or if it involved a custody response, by custody. TA ¶13; L.R. 56 (a)1 Stmt. ¶31.

On a number of occasions at Northern CI, Nurse Kindness has observed inmates in various states of undress, engaging in behavior which is sexually offensive, and which creates a sexually hostile work environment for her, as a female nurse. For example, she has been faced with situations in which male inmates compared the anatomy of female staff to that of nude women depicted in various sexually explicit publications. At times, she has been invited to look at the breasts on these nude models, or asked questions about other sexually offensive subjects. She has also encountered inmates who were openly displaying their penis or even worse, masturbating while waiting for her to come to the cell door to pass out medication. She has been confronted with this type of behavior often, ranging from several times a month to several times a week. Nurse Kindness finds this behavior incredibly disrespectful, and hostile and it creates a hostile environment for her in which to work. For this reason, the rule requiring inmates to be properly dressed before medication is passed serves a legitimate purpose in reducing such a sexually hostile work environment. KA ¶14. L.R. 56 (a)1 Stmt. ¶ 18.

Although C/O Trombly does not specifically remember March 16, 2003, he does know Anthony Torres because of his duties at Northern CI, and he is familiar with Torres' behavior and attitude. Inmate Torres is often disgruntled, angry and hostile toward staff, and is easily provoked when asked to follow rules and policies which are in place for the safety and security of staff and inmates. TA ¶14; L.R. 56 (a)1 Stmt. ¶32.

C/O Trombly did not in any way conspire with Nurse Kindness to deny inmate Torres his medication on March 16, 2003. If inmate Torres did not get his medication it was completely

due to his own behavior, because the nurse was ready to offer it.  It is the responsibility of the inmate to follow orders and cooperate with staff.  Indeed, if inmate Torres refused to cooperate it would be impossible to hand him the medication and do a mouth check, since the inmate is on the inside of the cell, and his cooperation is critical to the safe and secure passing of the med by the nurse.  TA ¶15. L.R. 56 (a)1 Stmt. ¶33.

Both Dr. Blanchette and Nurse Kindness reviewed the plaintiff's health record and can assure the court, to a reasonable degree of medical certainty, that plaintiff is not at any substantial risk of serious harm by the withholding of medication on one day.[1]  L.R. 56 (a)1 Stmt. ¶11.  Indeed, plaintiff would have suffered no appreciable risk to his health by missing a single dose of his medication.  BA ¶ 11;  KA ¶8. L.R. 56 (a)1 Stmt. ¶11.  Dr. Blanchette and Nurse Kindness base this conclusion on the fact that plaintiff's medical condition is not serious, but rather presents a mild case of hypertension, which is generally kept under good control, despite plaintiff's well-documented non-compliant behavior.  Plaintiff is prescribed 25 mg of Hydrochlorothiazide (HCTZ) once per day.[2]  He has been prescribed such medication for some period of time, with physician's orders indicating a four month regimen ordered on 8/1/01, and periodic six month renewals thereafter.  The normal dosage of HCTZ  is generally 50 mg.  The fact that Mr. Torres successfully manages his blood pressure with a low dose of 25 mg indicates

---

[1] The court's Ruling filed June 29, 2004,  indicated in part, that on the then existing court record, there was an "absence of facts in the record on the nature of Torres' condition or the risks of withholding medication," Ruling at 21, and also that "there are no facts in the record on which to evaluate whether Torres' medical condition is sufficiently serious to give rise to a constitutional violation, and whether the withholding of medication on one day would constitute a substantial risk of serious harm."  BA ¶10; KA ¶ 7. L.R. 56 (a)1 Stmt. ¶10.

[2] Hydrochlorothiazide is a diuretic and antihypertensive medication used to control high blood pressure.  L.R. 56 (a)1 Stmt. ¶13.

that he does not have a serious blood pressure problem. It may be that he could successfully be taken off the medication for a while and monitored to see if his blood pressure remains within acceptable limits without any medication. This may be difficult to manage in view of plaintiff's difficult and non-complaint behavior. BA ¶12; KA, ¶9. L.R. 56 (a)1 Stmt. ¶12.

Plaintiff is on a preventative HTN regimen to continue to preventatively and proactively attempt to reduce the risk factors which may lead to heart disease. A large part of preventing uncontrolled high blood pressure, which is a risk factor, depends on plaintiff's own compliance with his medication regimen. Because two risk factors are being overweight and having uncontrolled high blood pressure, plaintiff is prescribed the HTN protocol, which includes monthly weight checks and blood pressure. He is also prescribed a low dose of HCTZ. BA ¶13; KA ¶ 10; L.R. 56 (a)1 Stmt. ¶13. The fact that plaintiff missed a single day of HCTZ 25 mg on March 16, 2003, which is at issue in this case, would present no appreciable risk to plaintiff's health. The therapeutic effects of the medication may be slightly diminished over 24 hour period, but would not have presented any risk to Mr. Torres. Indeed, the Medication Administration Record (MAR) for March 2003, indicates that only on March 16, 2003, was the dose refused by plaintiff. See plaintiff's medical record pp. 248, 248 (a.). Every other day during March 2003 the medication was offered, taken by Mr. Torres and documented. Under these circumstances, to a reasonable degree of medical certainty, plaintiff would have experienced no significant risks to his health and his blood pressure would have remained within control during this 24 hour period of time. BA ¶14; KA ¶11; L.R. 56 (a)1 Stmt. ¶14. In view of the foregoing, it was completely reasonable and acceptable for Nurse Kindness to simply document the refusal on the MAR and report such refusal to the medical department. Any reasonable medical professional would know that such a low dose, refused on a single occasion,

would not subject a patient whose blood pressure was under control and being appropriately managed, to a significant risk of harm.  BA ¶15; KA ¶ 12;b L.R. 56 (a)1 Stmt. ¶15.

## STANDARD OF REVIEW

Under Rule 56(c), Fed.R.Civ.P., summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."  It has been held that summary judgment may be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and to which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 538 (1986); see also, Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 568-87, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). When a motion for summary judgment is adequately supported by documentary exhibits, depositions, answers to interrogatories or further affidavits, it must be controverted by a similar response setting forth specific facts showing that there is a genuine issue for trial, absent which summary judgment shall be entered, if appropriate.  Foster v. Turner Broadcasting, 844 F.2d 955, 959 (2nd Cir. 1988), cert. denied, 488 U.S. 994 (1988).  In other words, there must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A party opposing summary judgment may not rely on conjecture or conclusory assertions that the other party is not telling the truth.  See Gottlieb v. County of Orange, 84 F.3d. 511, 518 (2nd Cir. 1986).  Summary judgment dispositions have been encouraged as a valuable means for avoiding unnecessary trials, and modern Supreme Court and Second Circuit cases have encouraged its use for that purpose.  See e.g., Celotex, supra; H.L. Hayden Co. of N.Y. v. Siemens Medical

8

Systems, 879, F.2d 1005, 1011 (2nd Cir. 1989); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2nd Cir. (1986), cert. denied, 480 U.S. 932 (1987). It is particularly appropriate in cases under 42 U.S.C. § 1983 involving insubstantial claims such as this case. Harlow v. Fitzgerald, 457 U.S. 800, 816, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982).

Recently Judge Hall, in Reid v. Armstrong, 3:03CV208(JCH)(HBF)Ruling Re: Cross Motions for Summary Judgment (D.Conn. March 29, 2005)(Hall, J.), articulated in more detail the summary judgment standard, in granting defendants' motion for summary judgment. Judge Hall stated in part, with regard to the summary judgment standard, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991). A motion for summary judgment cannot be defeated "merely . . . on the basis of conjecture or surmise." Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (citation and internal quotation marks omitted).

## ARGUMENT

### I.    The Defendants Were Not Deliberately Indifferent To The Plaintiff's Medical Needs And Did Not Violate His Rights Under The Eighth Amendment Of The United States Constitution

To establish an unconstitutional denial of medical care, an inmate must prove "deliberate indifference to [his] serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 291 (1976). Mere negligence will not support a Section 1983 claim. The conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 203, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970). A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06).

Inmates do not have a constitutional right to the treatment of their choice.  See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Thus, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment.  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate indifference standard.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The alleged deprivation must be "sufficiently serious" in objective terms.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The term "serious medical need" contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain."  Hathaway, supra, 37 F.3d at 66 (quoting Nance v. Kelley, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)).  Factors which are relevant in determining the seriousness of a medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of a chronic and substantial pain."  Chance v. Armstrong, supra, 143 F.3d at 702 (citation omitted).  Also, where the denial of treatment causes a plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  See Harrison v. Barkley, 219 F.3d 136 (2d Cir. 2000).  Plaintiff makes no allegation of seriousness nor injury.

Not every medical condition is considered serious.  See e.g. Jones v. Lewis, 874 F.2d 1125 (6th Cir. 1989)(mild concussion and broken jaw); Hutchinson v. U. S., 838 F. 2d 390 (9th Cir. 1988)(kidney stone); Malsh v. Austin, 901 F.Supp. 757 (S.D.N.Y. 1995)(delay in providing routine dental treatment).  In Jones v. H.H.C. Inc.  2003 U.S. Dist. LEXIS 6510 (S.D.N.Y. 2003) the Southern District Court of New York noted that courts have strictly construed the physical injury requirement of §1997e(e), barring claims by prisoners who

demonstrate solely emotional or mental injury and barring physical injury claims where the injury alleged is de minimis. <u>Porter v. Coombe</u>, 1999 U.S. Dist. LEXIS 11924, 1999 WL 587896, at *2 (S.D.N.Y. Aug. 4, 1999). In <u>Jones</u>, a Muslim inmate alleged that he had been served pork in violation of his first amendment right to a diet consistent with his Muslim religion. He further alleged that the pork caused him to suffer from high blood pressure, which is the same medical claim which is made by Mr. Torres. The court rejected the high blood pressure claim, similar to the claim made by the plaintiff Torres in this case, and reasoned that high blood pressure fails to state a cognizable claim for physical injury. The defendants respectfully submit that as a matter of law, plaintiff's condition fails to meet the "serious medical condition" test. See also Dr. Blanchette's affidavit, ¶ 12 ("plaintiff's medical condition is not serious, but rather presents a mild case of hypertension, which is generally kept under good control,…"). Deft. L.R. 56 (a)1 Stmt. ¶12.

In reviewing plaintiff's claim of high blood pressure, the court in <u>Jones</u> recognized that although Jones claimed that he had suffered psychological damage, and that the porcine Heparin <u>elevated his blood pressure</u>, [emphasis added], these consequences of the defendants' conduct, even if established, <u>are clearly insufficient to meet the "physical injury" threshold.</u> See <u>Alonzo v. Squyres</u>, 2002 U.S. Dist. LEXIS 14935, 2002 WL 1880736 (N.D. Cal. Aug. 9, 2002)(emphasis added)(plaintiff taken to hospital for high blood pressure, brought on by "gruesome psychological harassment[]," has not suffered a prior physical injury). Cf. <u>Pinkston-Bey v. DeTella</u>, 1997 U.S. Dist. LEXIS 3969, 1997 WL 158343, at *3 (N.D. Ill. Mar. 31, 1997)(severe headaches are not physical injury) .

The plaintiff in this case has a well documented medical record of excellent blood pressure readings well within acceptable range. See Blanchette aff. ¶ 9, and medical records

attached thereto.  Deft. L.R. 56 (a)1 Stmt. ¶9.  Plaintiff's claim is essentially that the defendants were deliberately indifferent in refusing to offer a single dose of a mild antihypertensive medication on one occasion, March 16, 2003.  The inquiry into the issue of "serious medical need" is fact-specific and "must be tailored to the specific circumstances of each case." <u>Smith v. Carpenter</u>, 316 F.3d 178, 185 (2d Cir. 2003).  While the defendants in this case would not dispute the fact that in some other cases, not this one, high blood pressure may lead to a serious medical condition, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is  appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." <u>Id</u>. at 185 (citation omitted).  "In a case like this, however, where the prisoner is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." <u>Id</u>. at 186.  Here, the interruption was far less serious than in <u>Smith v. Carpenter</u>, one day, and the condition was far less serious.

In analyzing the severity of the alleged denial of medical care, "[t]he absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue." <u>Id</u>. at 187.  Here, the absence of any adverse medical effects strongly supports the defendants' claim that plaintiff has no evidence to support his of serious medical claims, but also, that it was objectively reasonable for Nurse Kindness to understand that it was permissible to forego a single dose of medication, when it is such a mild

hypertension medication, with a mild hypertension problem, and the plaintiff's blood pressure has been consistently under good control.  See Blanchette aff. ¶ 15.  It is respectfully suggested that the lack of any adverse effects is highly relevant to the inadequacy, indeed, frivolity, of plaintiff's claim, and requires that this factor be given substantial weight entitling the defendants' to summary judgment.  <u>Smith v. Carpenter</u>, at 187.  "The actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  <u>Id</u>.

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind."  <u>Chance</u>, <u>supra</u>, 143 F.3d at 702.  "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Id</u>. (<u>quoting</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 1994)).  Prison officials who are aware of serious risks to an inmate's health may not be found liable "if they responded reasonably to the risk, even if harm ultimately is not averted."  <u>Farmer v. Brennan</u>, <u>supra</u>, 511 U.S. at 844, 114 S. Ct. at 1982-83.

When the actions of the defendants are measured against these legal standards, it is clear that the defendants in the present case did not violate the plaintiff's rights under the Eighth Amendment and that summary judgment in their favor is appropriate.  There is no evidence in this case to satisfy either the objective Eighth Amendment "serious medical need" standard or the subjective "culpable state of mind" standard.  The plaintiff did not experience any adverse impact nor any significant risk to his health from missing a single dose of medication on March

16, 2003. ( Defts.' Rule 56(a)1 Stmt. ¶¶11, 14).    Moreover, even if it is assumed, arguendo, that plaintiff's condition is a "serious medical need" there is no evidence of either a significant risk to that need, objectively, or that subjectively, the defendants were deliberately indifferent to such need.  Nurse Kindness would have no way of knowing that missing a single dose of a mild medication for a mild problem would cause a significant injury.  She followed her policy and procedure and documented the refusal.  If the prescribing physician were so inclined, he could have, upon review of the chart, ordered further medication orders.  However, none were necessary in view of the de minimus interruption in delivery of medication.

To establish deliberate indifference, the plaintiff must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs."  Chance, 143 F.3d at 703 (citing Farmer v. Brennan, 511 U.S. 825 at 837.  Deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to  abate it."  Farmer, 511 U.S. at 847; see also Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994); Harrison v. Barkley, 219 F.3d 132, 137-138 (2nd Cir. 2000).

As a matter of law, it is impossible for plaintiff to meet that test in this case.  Here, it is not disputed plaintiff's condition is not serious, and there is no medical evidence to support the allegation that plaintiff's blood pressure is out of control or not properly managed.  At all times relevant to this case plaintiff's medication dose was 25 mg, a minor dosage, for a relatively minor problem.  Moreover, Nurse Kindness would have no way of knowing that missing a single dose, of a minor dosage for a non-serious blood pressure problem would present the plaintiff with a "substantial risk of serious harm."  See Farmer, supra; see also Blanchette affidavit, ¶ 15. According to Dr. Blanchette, "it would have been completely reasonable and acceptable for a nurse to simply document the refusal on the MAR and report such refusal to the medical

department.  Any reasonable medical professional would know that such a low dose, refused on a single occasion, would not subject a patient whose blood pressure was under control and being appropriately managed, to a significant risk of harm."  Thus, as a matter of fact and law, Nurse Kindness could not have known of a substantial risk to plaintiff's health because none existed, and thus, she is entitled to judgment as a matter of law.  Deft. L.R. 56 (a)1 Stmt. ¶ ¶14, 15.

Officer Trombly simply was the escorting officer providing safety and security for the nurse.  He had no personal involvement in the administration of medication.  See Trombly affidavit, ¶¶ 5, 9.  Deft. L.R. 56 (a)1 Stmt. ¶¶21-27.  As discussed below, Mr. Trombly is entitled to summary judgment as well.

## II.    Correction Officer Trombly Lacks Personal Involvement in Medical Issues

Personal involvement in an alleged constitutional deprivation is a prerequisite to an award of damages under 42 U.S.C. § 1983.  Merriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989); Williams v. Smith, 781 F.2d 319 (2d Cir. 1986); Ayers v. Coughlin, 780 F.2d 205 (2d Cir. 1985); McKinnon v. Patterson, 568 F.2d 930 (2d Cir. 1977); cert. denied, 434 U.S. 1087 (1978).  The doctrine of respondeat superior is not applicable to § 1983 cases.  Monell v. New York City Dep't of Social Services, 436 U.S. 658, 692-95 (1978).  In his complaint, plaintiff alleges that Trombly and Kindness "conspired" to deprive plaintiff of a single dose of medication.  As is apparent from Mr. Trombly's affidavit, the cooperation of the inmate is critical in the inmate being able to receive medication offered by a nurse at Northern CI.  First, the inmate must be awake and properly dressed, waiting at the cell door to receive the medication. Trombly aff. ¶ 6-7.  Deft. L.R. 56 (a)1 Stmt. ¶24-25.  Mr. Trombly states that "[t]he inmate must come to the door, and [he has] to open the slot, often called the "trap," which is

usually secured from the outside, and which [he] opens so that the nurse may pass the med to the inmate through the slot in the door."  Trombly aff. ¶ 8. Deft. L.R. 56 (a)1 Stmt. ¶26.

In <u>Hemmings v. Gorczyk</u> 134 F.3d 104 (2nd Cir. 1998) the Second Circuit affirmed the district court's dismissal of Hemmings' in forma pauperis complaint under 28 U.S.C. §1915(d) because as Hemmings, like the plaintiff Torres in this case, attempts to implicate these defendants in wide-ranging conspiracies,  clearly without foundation, to violate his constitutional rights.  The court found that Hemmings had not sufficiently alleged  facts supporting an alleged "conspiracy" and discredited Hemmings' "disturbing allegations" of far-flung and far-fetched conspiracies to violate his constitutional rights.  <u>Hemmings v. Gorczyk</u> 134 F.3d at 107-108.

The complaint's conclusory, vague, and general allegations of a  conspiracy between Trombly and Kindness do not therefore suffice to establish that the defendants participated in any conduct to violate plaintiff's constitutional rights.  See Ruling [Doc. #28] at 17 (noting that plaintiff withdrew his §1985(3) conspiracy claims).  <u>Polur v. Raffe</u>, 912 F.2d 52, 56 (2d Cir. 1990) (dismissing claims based on allegations of a  conspiracy  where plaintiff "relied on diffuse averments but[did] not provide a factual basis for his claim or plead overt acts indicating the existence of a  conspiracy"); <u>Sommer v. Dixon</u>, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of  conspiracy . . . cannot withstand . . . dismissal.").  The plaintiff's complaint as to C/O Trombly, therefore, both is frivolous and fails to state a valid claim.

### III.    The Defendants Are Entitled To Qualified Immunity For Their Actions As Alleged In The Plaintiff's Complaint

The shield of qualified immunity generally protects government officials from liability for damages on account of their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). The availability of the defense turns upon the "objective legal reasonableness" of the allegedly unlawful official action, "assessed in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting Harlow v. Fitzgerald, 457 U.S. at 818-19, 102 S.Ct. at 2739). *See also,* Glass v. Mayas, 984 F.2d 55, 57 (2d Cir. 1993). The qualified immunity defense is intended to "strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Lee v. Sandberg, 136 F.3d 94, 100 (2d Cir. 1997) (citations omitted). The rule serves to protect government officials from charges that they knowingly violated standards that were in fact unknowable. Havekost v. U.S. Dept. of Navy, 925 F.2d 316 (9th Cir. 1991) (citations omitted).

Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 252 (2001), citing Mitchell v. Forsyth, 472 U.S. 511, 526, 86 L.Ed. 2d 411, 105 S. Ct. 2806 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Id., 533 U.S. at 201. As a result, the Court has repeatedly stressed the importance of resolving immunity

questions at the earliest possible stage in litigation.  Id., citing Hunter v. Bryant, 502 U.S. 224, 227, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991) (*per curiam*).

In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence.  According to Saucier, a court required to rule upon the qualified immunity issue must first consider this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  Id. citing Siegert v. Gilley, 500 U.S. 226, 232, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991).  Here, as discussed earlier, plaintiff cannot meet his threshold burden of proving a constitutional violation, thus, there is no need to reach the qualified immunity question.  However, as explained by the Court in Saucier,

> In the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.  This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry.  The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

Id., 533 U.S. at 201.

If no constitutional right would have been violated were the allegations established, Saucier instructs that there is no necessity for further inquiries concerning qualified immunity.  On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.  *Id.,* 501 U.S. at 201.  This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.  As

more fully articulated by the U.S. Supreme Court in <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002),

> Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful. For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

<u>Id.</u>, 536 U.S. at 739, (internal citations and quotations omitted). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. <u>Saucier v. Katz, supra</u>. If the law did not put the officer on notice that his conduct would be clearly unlawful, judgment based on qualified immunity is appropriate. <u>Id</u>. Under the circumstances of this case, it would have been entirely reasonable for C/O Trombly to believe that an inmate must follow orders given to him by DOC staff, and that such orders were designed to assure that female nursing staff were not subjected to sexually harassing or offensive behavior from scantily clad inmates. <u>See Mauro v. Arpaio</u> 188 F.3d 1054 (9th Cir. 1999)(en banc) <u>cert. denied</u> 529 U.S. 1018 (2000)(prisoner challenged a jail policy which denied his access to sexually explicit materials under U.S. Const. amend. I. The court affirmed a summary judgment for defendants because the policy was reasonably related to legitimate penological interests.) In <u>Mauro v. Arpaio</u>, the court found that, like the situation at issue in this case, (see affidavit of Nurse Kindness), female detention officers were faced with situations in which male inmates compared the officers' anatomy to that of nude women depicted in various publications, often Playboy magazine centerfolds. The officers would be invited to look at the breasts on these nude models, or asked their opinion about shaved genitalia. The officers would also encounter inmates who were

19

openly masturbating while looking at sexually explicit pictures.  One inmate told an officer that he was mentally having anal intercourse with Miss July, and when he was done, he was going to do the same to the officer.  The officers were confronted with this type of behavior often, ranging from several times daily to several times a week.  Id. at 1057.  The Ninth Circuit sitting en banc concluded that, "The jail's policy of excluding sexually explicit materials is expressly aimed at maintaining jail security, rehabilitating inmates and reducing sexual harassment of female detention officers.  It is beyond question that both jail security and rehabilitation are legitimate penological interests. Id. at 1059. (emphasis added).  Thus, the T-shirt rule alleged to be at issue here, is more importantly part of a general rule that inmates be properly dressed, decent, respectful and cooperative when in cell and awaiting medication from a female nurse.  It is not reasonable to subject female nurses to a sexually hostile work environment, in which inmates are free to be in various states of undress while interacting with female staff.

The plaintiff does not have a clearly established constitutional right in prison to be half naked while he is in his cell.  Of course, there is no definitive guide as to when a right is clearly established.  Thus, while the defendants do not question the existence of a suspect's Fourth Amendment right to be free from unreasonable seizure generally there is no right of privacy or fourth amendment protection with regard to a prisoner cell.  See Hudson v. Palmer, 468 U.S. 517 (1984).

> the relevant inquiry is not whether the defendants should have known that there was a federal right, in the abstract ..., but whether the defendants should have known that the specific actions complained of violated  ... [that right].  Such an inquiry requires that a court define the constitutional right with some specificity.  If the right is defined too broadly, plaintiff would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

<u>Lewis v. Cowen</u>, 165 F.3d 154, 167 (2d Cir. 1999) (internal quotations and citations omitted).  In the absence of controlling precedent, decisions from other circuits must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.  <u>Marsh v. Arn</u>, 937 F.2d 1056, 1068 (6th Cir. 1991) (citations omitted).[3]

Assuming that the factual allegations in a particular case demonstrate that there exists an underlying constitutional right, and that this right was clearly established in a particularized sense at the time the defendants acted, the final inquiry which must be undertaken in the qualified immunity analysis is the question of whether, despite the nature of the constitutional right at issue, a reasonable officer could have been mistaken as to the legal constraints upon his conduct.  If such a mistake as to the legal constraints upon his conduct was objectively reasonable, the defendant is nonetheless entitled to qualified immunity.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular [governmental] conduct.  It is sometimes difficult for an [official] to determine how the relevant legal doctrine [...] will apply to the factual situation the [official] confronts.   If the [official's] mistake as to what the law requires is reasonable, however, the [official] is entitled to the immunity defense.

<u>Saucier v. Katz</u>, supra.  <u>See also, Malley v. Briggs</u>, 475 U.S. 335, 343, 89 L.Ed.2d 271, 106 S.Ct. 1092 (1986) (qualified immunity leaves ample room for mistaken judgments).  Thus, qualified

---

[3]    As stated by the Second Circuit in <u>Poe v. Leonard</u>, 282 F.3d 123 (2nd Cir. 2002), "[i]t is unclear the extent to which we may rely on the case law of other circuits to determine whether the law was clearly established." <u>Id.</u>, 282 F.3d at 141, n. 15.  Accordingly, in those cases where the Second Circuit has relied upon the law established in other circuits as a guide for its own legal analysis, it has done so only where our precedent had foreshadowed the development of the relevant standards that other circuits had clearly established.  <u>Id.</u>, <u>citing Varrone v. Bilotti</u>, 123 F.3d 75 (2d Cir. 1997).

immunity protects "all but the plainly incompetent or those who knowingly violate the law, or those who act where "the law clearly proscribed the actions" taken." Saucier, supra, (quoting Anderson v. Creighton, 483 U.S. at 638-39). This aspect of the doctrine of qualified immunity recognizes that public officials and state employees are only human, and inevitably, accidents and mistakes of judgment will happen. Such mistakes alone do not open officers to personal liability. Wren v. Towe, 130 F.3d 1154, 1159 (5th Cir. 1997), cert. denied, 525 U.S. 815, 142 L. Ed. 2d 40, 119 S. Ct. 51 (1998); accord, Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992) (indicating that qualified immunity affords tolerance for mistakes of judgment traceable to unsettled law, faulty information, or contextual exigencies). Accordingly,

> In cases involving the conduct of police officials, … even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the challenged act . . . . The objective reasonableness test is met - and the defendant is entitled to qualified immunity - if officers of reasonable competence could disagree on the legality of the defendant's actions . . . . In qualified immunity cases, we are not concerned with the correctness of the defendants' conduct, but rather with the "objective reasonableness" of their chosen course of action given the circumstances confronting them at the scene . . . . [W]hen the factual record is not in serious dispute . . . [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.

Lennon v. Miller, 66 F.3d 416, 420-21 (2d Cir. 1995) (quotations and internal citations omitted); accord, Oliviera v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994), cert. denied, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995) (immunity ordinarily should be decided by the court in those cases where the facts concerning the availability of the defense are undisputed).

The Court's more general statement in Anderson v. Creighton, supra, addressed to qualified immunity for a Fourth Amendment violation used as its standard the "reasonable officer" and what "could reasonably have been thought lawful" by such an officer, terms

suggesting a measure of deference.  Id., 483 U.S. at 638.  Accordingly, in view of the reasonableness of a rule requiring inmates to be properly dressed, and decently presented to staff when receiving medications, the lack of any clearly established authority prohibiting such a reasonable rule designed to reduce sexually offensive behavior from inmates, and the low dosage of medication the plaintiff was on, it was entirely reasonable for Nurse Kindness to follow policy and procedure and simply document the plaintiff's refusal of medication on the appropriate form. This form could be reviewed by a physician who could review and revise medication orders if that were appropriate.  In view of the minor dosage and relatively excellent management of plaintiff's blood pressure, it was reasonable to allow plaintiff to refuse to accept his medication on March 16, 2003.  There would be no way of knowing that such a decision which was based on plaintiff's own conduct would present any "substantial risk" to plaintiff's health.

Analysis of the facts of this case establishes that, at its worst, reasonable officers could differ as to what action should have been taken, and as to whether the actions, in fact, taken by the defendants were appropriate under the totality of the circumstances known to them at the time.  Accordingly, the defendants are entitled to qualified immunity for their actions relative to the instant litigation as articulated in the plaintiff's complaint.

## CONCLUSION

For all the foregoing reasons, and for the reasons set forth in the accompanying affidavits and Local Rule 56 statement, as well as for the reasons stated by this Court in prior decisions in this case, the defendants are entitled to summary judgment and their motion for summary judgment should be granted.

DEFENDANTS
"John" Trombly, et.al

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:     ___/s/_____
        Steven R. Strom
        Assistant Attorney General
        110 Sherman Street
        Hartford, CT  06105
        Federal Bar #ct 01211
        E-Mail:  steven.strom@po.state.ct.us
        Tel.: (860) 808-5450
        Fax: (860) 808-5591


**<u>CERTIFICATION</u>**

I hereby certify that a copy of the foregoing was mailed to the following on this 20th day

of April, 2005:

        Anthony Torres, Inmate #246027
        Northern Correctional Institution
        P.O. Box 665
        Somers, CT 06071


        ___/s/_____
        Steven R. Strom
        Assistant Attorney General