UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANTHONY TORRES | : | CIVIL NO. 3:03CV696(JBA)(JGM) |
| v. | : | |
| JOHN TROMBLY, ET.AL. | : | APRIL 20, 2005 |

### DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT

1.  Edward Blanchette is a physician licensed to practice medicine in the State of Connecticut since 1975. Blanchette Affidavit ("BA") ¶1.

2.  He completed his residency in Medicine at Saint Francis Hospital, Hartford, Connecticut in 1977, and completed a Fellowship in Infectious Disease and Microbiology from the University of Connecticut School of Medicine in 1979. BA ¶2.

3.  Dr. Blanchette has held various positions with the Connecticut Department of Correction since 1984, including Hospital Clinical Director at the Connecticut Correctional Institution in Somers, Connecticut, Acting Director of Health Services and Clinical Practice Coordinator, and the Medical Director at the MacDougall Correctional Institution (MCI) in Suffield, Connecticut, where his duties including providing direct patient care to inmates. BA ¶3.

4.  Dr. Blanchette is presently the Director of Clinical and Professional Services for the Department of Correction. BA ¶4.

5.  In 1995-1996, the State of Connecticut, Department of Correction contracted with the University of Connecticut Health Center to provide treatment to Connecticut prisoners through an organization developed as Correctional Managed Health Care (CMHC). BA ¶5; Kindness Affidavit, ("KA") ¶2.

6.  Both Dr. Blanchette and Nurse Kindness are familiar with the policies and practices utilized by CMHC for the purpose of providing medical treatment to prisoners in the custody of the Connecticut Department of Correction (DOC).  They are also familiar with Northern CI, and the medical records of the plaintiff inmate, Anthony Torres, which they have reviewed in connection with preparing their affidavits in this case.  BA ¶6; KA ¶3.

7.  Currently, Mr. Torres is being managed appropriately, well within acceptable standards of medical care, for a mild problem of hypertension (HTN), or high blood pressure.  His blood pressure readings, however, are monitored frequently (approximately monthly, except when plaintiff refuses), and are well within acceptable limits.  Indeed, they are quite good.  BA ¶7; KA ¶4.

8.  For example, at p. 102 of the plaintiff's medical record, there is an order dated 1/26/01 for "BP's q wk  x 4 wk," [blood pressures weekly for four weeks] then monthly, with a goal range of <140/90.  Throughout 2001 and 2002, plaintiff's blood pressure checks were regularly excellent, ranging from 112/68 to 128/80.  See p. 102, attached to Blanchette affidavit.  BA ¶8; KA ¶5.

9.  Blood pressure checks were continued monthly throughout 2003, as well as 2004-05, although Mr. Torres on a number of occasions refused to cooperate with medical staff to have his blood pressure measured.  The blood pressures which were charted around the time in question were completely within acceptable limits, with a reading of 108/70 on June 30, 2003, and 118/86 in August 2003.  See p. 11 of plaintiff's medical record.  BA ¶9; KA ¶6.

10.  Both Dr. Blanchette and Nurse Kindness read that portion of the court's Ruling filed June 29, 2004, which indicates in part, that on the then existing court record, there was an "absence of

2

facts in the record on the nature of Torres' condition or the risks of withholding medication," Ruling at 21, and also that "there are no facts in the record on which to evaluate whether Torres' medical condition is sufficiently serious to give rise to a constitutional violation, and whether the withholding of medication on one day would constitute a substantial risk of serious harm." BA ¶10; KA ¶ 7.

11.     In order to answer these questions they reviewed the plaintiff's health record and can assure the court, to a reasonable degree of medical certainty, that plaintiff is not at any substantial risk of serious harm by the withholding of medication on one day. Indeed, plaintiff would have suffered no appreciable risk to his health by missing a single dose of his medication. BA ¶ 11; KA ¶8.

12.     Dr. Blanchette and Nurse Kindness base this conclusion on the fact that plaintiff's medical condition is not serious, but rather presents a mild case of hypertension, which is generally kept under good control, despite plaintiff's well-documented non-compliant behavior. Plaintiff is prescribed 25 mg of Hydrochlorothiazide (HCTZ) once per day. He has been prescribed such medication for some period of time, with physician's orders indicating a four month regimen ordered on 8/1/01, and periodic six month renewals thereafter. The normal dosage of HCTZ is generally 50 mg. The fact that Mr. Torres successfully manages his blood pressure with a low dose of 25 mg indicates that he does not have a serious blood pressure problem. It may be that he could successfully be taken off the medication for a while and monitored to see if his blood pressure remains within acceptable limits without any medication. This may be difficult to manage in view of plaintiff's difficult and non-complaint behavior. BA ¶12; KA, ¶9.

13. Hydrochlorothiazide is a diuretic and antihypertensive medication used to control high blood pressure. Plaintiff is on a preventative HTN regimen to continue to preventatively and proactively attempt to reduce the risk factors which may lead to heart disease. A large part of preventing uncontrolled high blood pressure, which is a risk factor, depends on plaintiff's own compliance with his medication regimen. Because two risk factors are being overweight and having uncontrolled high blood pressure, plaintiff is prescribed the HTN protocol, which includes monthly weight checks and blood pressure. He is also prescribed a low dose of HCTZ. BA ¶13; KA ¶ 10.

14. The fact that plaintiff missed a single day of HCTZ 25 mg on March 16, 2003, which is at issue in this case, would present no appreciable risk to plaintiff's health. The therapeutic effects of the medication may be slightly diminished over 24 hour period, but would not have presented any risk to Mr. Torres. Indeed, the Medication Administration Record (MAR) for March 2003, indicates that only on March 16, 2003, was the dose refused by plaintiff. See plaintiff's medical record pp. 248, 248 (a.). Every other day during March 2003 the medication was offered, taken by Mr. Torres and documented. Under these circumstances, to a reasonable degree of medical certainty, plaintiff would have experienced no significant risks to his health and his blood pressure would have remained within control during this 24 hour period of time. BA ¶14; KA ¶11.

15. In view of the foregoing, it was completely reasonable and acceptable for Nurse Kindness to simply document the refusal on the MAR and report such refusal to the medical department. Any reasonable medical professional would know that such a low dose, refused on a single

occasion, would not subject a patient whose blood pressure was under control and being appropriately managed, to a significant risk of harm. BA ¶15; KA ¶ 12.

16. Indeed, at Northern CI, medication is administered by passing the pill through the slot in the door. If the inmate refuses to get up from the bed, or to get properly dressed, it would not be appropriate to enter the cell to force a medication in such an instance where there is no appreciable risk in missing a single dose, or missing occasional doses from time to time. BA ¶16; KA ¶13.

17. Both Dr. Blanchette and Nurse Kindness reviewed the MAR and refusal forms filled out by Nurse Deborah Kindness, and she followed policy and procedure appropriately. Neither she, nor her supervisor, nor any physician would have any serious concerns of significant risk upon review the refusal of a low dose, 25 mg HCTZ, on a single day, and it would be completely reasonable under these circumstances to simply document the refusal and attempt to offer the medication the next day. The benefit of such a preventative regimen is continued general compliance over a life-long period of time for what may be a chronic, but mild condition. Occasional refusals by the patient under these circumstances do not present a significant risk of serious harm to Mr. Torres. BA ¶17; KA ¶15.

18. On a number of occasions at Northern CI, Nurse Kindness has observed inmates in various states of undress, engaging in behavior which is sexually offensive, and which creates a sexually hostile work environment for her, as a female nurse. For example, she has been faced with situations in which male inmates compared the anatomy of female staff to that of nude women depicted in various sexually explicit publications. At times, she has been invited to look at the breasts on these nude models, or asked questions about other sexually offensive subjects.

Case 3:03-cv-00696-JBA     Document 73-3     Filed 04/20/2005     Page 6 of 9

She has also encountered inmates who were openly displaying their penis or even worse, masturbating while waiting for her to come to the cell door to pass out medication. She has been confronted with this type of behavior often, ranging from several times a month to several times a week. Nurse Kindness finds this behavior incredibly disrespectful, and hostile and it creates a hostile environment for her in which to work. For this reason, the rule requiring inmates to be properly dressed before medication is passed serves a legitimate purpose in reducing such a sexually hostile work environment. KA ¶14.

19.     Anthony Trombly is employed as a correction officer ("C/O") by the Connecticut Department of Correction, and he has been so employed since October 5, 1990. He has been employed at Northern CI since it opened. Trombly Affidavit ("TA") ¶1.

20.     His duties include care and custody of inmates, and providing for reasonable safety and security for staff, inmates, the facility and the public. TA ¶2.

21.     At times, C/O Trombly may be assigned to be an escorting officer to provide a security escort for any staff or visitor who requires an escort. TA ¶3.

22.     On March 16, 2003, according to a medical refusal form, Nurse Kindness was assigned to pass out medication, and C/O Trombly was assigned as an escorting officer for her. TA ¶4.

23.     C/O Trombly's duties do not include, nor have they ever included, passing out medication. TA ¶5.

24.     His primary duty when escorting a nurse doing med pass is to make sure the inmate is awake, and presents himself properly at the cell door. The inmate should be respectful and cooperative, following the officer's instructions, in order to accept medication which is going to be offered to him by the nurse. TA ¶6.

6

25.    In order to pass meds, C/O Trombly escorts the nurse to the designated cell, he knocks on the door, which is a solid steel door with a small window, and he announces that the nurse is present for meds. The inmate remains in the cell for safety and security of staff, and medication is given if the inmate is properly attired, following orders, and cooperative. TA ¶7.

26.    The inmate must come to the door, and the C/O has to open the slot, often called the "trap," which is usually secured from the outside, and which the C/O opens so that the nurse may pass the med to the inmate through the slot in the door. TA ¶8.

27.    The nurse will give the medication to the inmate and basically C/O Trombly is just a security escort. TA ¶9.

28.    C/O Trombly does not know what medications are given, nor does he know for what reason a medication is ordered. That kind of information is kept confidential and is solely known to the nurse who is being escorted and who is responsible for medication administration. TA ¶10.

29.    If the inmate is cooperative, and follows orders given, he will come to the door, take the medication which is offered, and stand next to the door, with his mouth visible through the window. The nurse will ask the inmate to open his mouth for a mouth check to make sure the inmate swallows the medication. C/O Trombly has observed this procedure performed by nurses, but he does not get involved in the medical issues. He is just there for safety and security concerns. TA ¶11.

30.    Obviously, if an inmate refuses to cooperate, for example by not following orders, not getting dressed properly, engaging in hostile verbal exchanges, or if the inmate demonstrates a

belligerent attitude, for example by refusing to come to the door, the nurse may not be able to offer the medication due to the safety and security issues posed by the inmate. TA ¶12.

31.    Staff have been assaulted through the slot in the door with unknown liquid substances, often stored by the inmate in his toilet, to include toilet water and human waste. If an inmate refuses his medication, that refusal would usually be documented by medical, or if it involved a custody response, by custody. TA ¶13.

32.    Although C/O Trombly does not specifically remember March 16, 2003, he does know Anthony Torres because of his duties at Northern CI, and he is familiar with Torres' behavior and attitude. Inmate Torres is often disgruntled, angry and hostile toward staff, and is easily provoked when asked to follow rules and policies which are in place for the safety and security of staff and inmates. TA ¶14.

33.    C/O Trombly did not in any way conspire with Nurse Kindness to deny inmate Torres his medication on March 16, 2003. If inmate Torres did not get his medication it was completely due to his own behavior, because the nurse was ready to offer it. It is the responsibility of the inmate to follow orders and cooperate with staff. Indeed, if inmate Torres refused to cooperate it would be impossible to hand him the medication and do a mouth check, since the inmate is on the inside of the cell, and his cooperation is critical to the safe and secure passing of the med by the nurse. TA ¶15.

|  |  |
|---|---|
|  | DEFENDANTS<br>"John" Trombly, Et Al.<br><br>RICHARD BLUMENTHAL<br>ATTORNEY GENERAL |
| BY: | __/s/_____<br>Steven R. Strom<br>Assistant Attorney General<br>110 Sherman Street<br>Hartford, CT  06105<br>Federal Bar #ct01211<br>E-Mail:  steven.strom@po.state.ct.us<br>Tel: (860) 808-5450<br>Fax: (860) 808-5591 |

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed to the following on this 20th day of April 2005:

Anthony Torres, Inmate #246027
Northern Correctional Institution
P.O. Box 665
Somers, CT  06071


__/s/_____
Steven R. Strom
Assistant Attorney General